# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| **ROBERT J. KEACH,** solely in his capacity ) | |
| as the trustee for ) | |
| **MONTREAL, MAINE & ATLANTIC** ) | |
| **RAILWAY, LTD.,** ) | |
| ) | |
| **Appellant,** ) | |
| ) | |
| v. ) | **1:17-cv-00012-JDL** |
| ) | |
| **WHEELING & LAKE ERIE RAILWAY** ) | |
| **COMPANY,** ) | |
| ) | |
| **Appellee.** ) | |

## ORDER ON BANKRUPTCY APPEAL

Robert J. Keach, as the Chapter 11 Trustee (the "Trustee") for the appellant Montreal, Maine & Atlantic Railway, Ltd. ("MMA"), appeals from an order granting Wheeling & Lake Erie Railway Company's ("Wheeling's") motion to dismiss MMA's Complaint, entered by the United States Bankruptcy Court for the District of Maine on December 23, 2016. Keach filed a timely notice of appeal pursuant to 28 U.S.C.A. § 158(a)(1) (2017) and Federal Rules of Bankruptcy Procedure 8001(b), 8003(a)(1), and 8005.

For the reasons explained below, I affirm the Bankruptcy Court's order.

## I. FACTUAL BACKGROUND

The following facts are taken from MMA's Complaint and are accepted as true for the purposes of this appeal.

In 2002 and 2003, the debtor, MMA, and four related corporations (collectively, the "MMA Companies")[1] entered into a series of financial transactions in which they purchased the assets of several American and Canadian railroad companies. As part of these transactions, MMA executed a Rail Funding Agreement with the State of Maine Department of Transportation and a separate Note and Warrant Purchase Agreement ("NWPA") with a group of corporate and individual investors (the "Investors") who invested $15,000,000 in the MMA Companies in exchange for certain subordinated notes and warrants. The Investors taking part in the NWPA included ABC Railway, Inc., a wholly-owned subsidiary of Wheeling, and Larry R. Parsons, the Chairman and Chief Executive Officer of Wheeling and a member of the MMA Board of Directors.

In March 2005, the Federal Railroad Administration ("FRA") loaned $34,000,000 to MMA in exchange for a senior lien on MMA's rail lines and related tracks and improvements. Four years later, in June 2009, Wheeling provided MMA with a line of credit of up to $6 million (the "Wheeling Note") and entered into a related Security Agreement with MMA.

In 2010, despite the FRA loan and the influx of credit from Wheeling, MMA was unable to meet all of its financial obligations to its creditors and decided to liquidate some of its rail lines (the "Lines") and other assets in order to reduce the amount of its debt. This liquidation included a sale of the Lines to the State of Maine.

---

[1] The MMA companies were: MMA; Montreal, Maine & Atlantic Corporation; LMS Acquisition Corporation; Montreal, Maine & Atlantic Rolling Stock Corporation; and Montreal, Maine & Atlantic Canada, Co.

## A. The Second Amendment to the FRA Mortgage

In anticipation of the sale to the State of Maine, MMA and the FRA executed a 2010 agreement called the "Loan Workout Agreement and Amendment No. 2 to Financing Agreement, Mortgage, and Security Agreement" (the "Second Amendment") in which the FRA agreed to provide a limited waiver of its security interest in the Lines so that MMA would be able to convey them free and clear of any liens and encumbrances. *See* ECF No. 6 at 101.

The limited waiver is contained in § 3(b) of the Second Amendment, and was made effective "upon the closing of the purchase and sale of the Lines to the State of Maine[.]" *Id.* at 105. Rather than receive the full proceeds of the sale, the FRA directed that the proceeds go to an escrow agent. *Id.* The Second Amendment then directed that, "upon perfection of Lender's Replacement Lien on Canadian Assets," $2,372,934.96 of the sale proceeds be paid to the FRA, representing the sum of its overdue principal and accrued interest. Pl.'s App. at 103. After the payment to the FRA, the Second Amendment directed that the balance of the sale proceeds be distributed in the following order of priority:

> *Second,* to the Investors on Schedule I to that certain Note and Warrant Purchase Agreement, dated January 8, 2003, as amended, in the amount of $13,862,165.29 if paid on December 28, 2010, plus $4,581.36 for each day thereafter, to pay in full debt obligations including principal and interest;

> *Third*, to [MMA], in the amount of $1,082,685.79, for accounts payable due and owing.

> *Fourth,* the balance to the Wheeling and Lake Erie Railway Company to reduce the outstanding balance on Borrower's line of credit.

ECF No. 6 at 105.

In January 2011, MMA entered into a Purchase and Sale Agreement with the State of Maine for the sale of five rail lines for $21,100,000. After the closing was held, the proceeds from the sale were distributed as directed by the Second Amendment, with the balance of the sale proceeds, $2,708,912.20, paid to Wheeling. Several years later, in August 2013, MMA filed a Chapter 11 petition for bankruptcy.

## B.    The Estate Representative's Complaint and Wheeling's Motion to Dismiss

In May 2015, the Trustee filed a one-count complaint against Wheeling alleging that the $2.7 million payment to Wheeling following the 2011 sale of the Lines was a fraudulent transfer under § 5(b) of the Uniform Fraudulent Transfer Act, 14 M.R.S.A. § 3576(2) (2017), which states that:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the debtor insider had reasonable cause to believe that the debtor was insolvent.

14 M.R.S.A. § 3576. Keach sought to void the payment pursuant to § 544(b) of the Bankruptcy Code, 11 U.S.C.A. § 544(b) (2017).[2] The Complaint explicitly referenced the priority of payments set forth in the Second Amendment, *see* Pl.'s App. at 6-7, ¶¶ 31, 32, although it did not include the Second Amendment as an exhibit. The parties do not dispute the authenticity of the Second Amendment.

Wheeling filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Bankruptcy Rule 7012 for failure to state a claim upon which relief can

---

[2] Title 11 U.S.C.A. § 544(b) authorizes a trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502." Although the statute uses the term "avoid," meaning "to render void," *Black's Law Dictionary* at 156 (9th ed. 2009), I use the more common term "void."

be granted, arguing that there could not have been a fraudulent transfer of funds within the meaning of the Maine Uniform Fraudulent Transfer Act. Specifically, Wheeling contended that the $2.7 million paid to Wheeling in accordance with the Second Amendment was encumbered by the FRA's lien and thus was not an asset of the MMA Estate within the meaning § 3576 of the Maine Uniform Fraudulent Transfer Act. Wheeling also argued that Keach had acknowledged as much in his Complaint by alleging that MMA "paid Wheeling . . . $2,708,912.20, *even though the FRA, not Wheeling, was entitled to the proceeds of the sale of the Lines.*" *Id.* at 9 (emphasis in original). Wheeling contended that because the $2.7 million payment was not an asset of the MMA Estate, it did not constitute a fraudulent transfer.

Arguing in opposition to the motion to dismiss, Keach claimed that the FRA did not have a valid lien on the sale proceeds at the time the funds were transferred because the Second Amendment released the FRA's security interest prior to the transfer of funds, after the FRA had secured a lien on the replacement collateral.[3]

## C.   The Bankruptcy Court's Opinion

The Bankruptcy Court granted Wheeling's motion to dismiss, concluding that because the FRA was able to dictate the distribution of the sale proceeds to the MMA Estate's creditors, as provided for in § 3(b) of the Second Amendment, the FRA had a security interest in the sale proceeds which rendered the proceeds encumbered and not an asset of MMA. The court explained:

> The sale of the rail lines, the payment of the purchase price, the
> distribution of the payment proceeds, and the provision of additional

---

[3] Keach did not specify when the FRA perfected its security interest in this replacement collateral. *See* ECF No. 21 at 4-7.

> collateral were all part and parcel of a single deal.  As such, money paid
> to Wheeling was fully encumbered [until] the moment it was paid, and
> thus was not an asset transferred within the meaning of [the] UFTA.

ECF No. 4 at 19-20.  Moreover, the Bankruptcy Court reasoned, while the FRA had

agreed to release its lien in the rail lines being sold, the Complaint did not allege that

the FRA agreed to release its lien in the proceeds of the sale.  The Bankruptcy Court

also concluded that it was appropriate to rely on the Second Amendment in deciding

the motion to dismiss despite the fact that it was not attached to the Complaint

because the Trustee relied upon and quoted from the Second Amendment and did not

contest its authenticity.

The Bankruptcy Court dismissed the Trustee's Complaint with prejudice.

## II. STANDARD OF REVIEW

A District Court reviews a Bankruptcy Court's rulings of law *de novo* and

findings of fact for clear error.  *In re Rivera Balaguer,* --- F. Supp. 3d ----, 2017 WL

1753314, at *1 (D.P.R., Mar. 31, 2017) (citing *Prebor v. Collins,* 143 F.3d 1, 3 (1st Cir.

1998)).  To survive a motion to dismiss, a complaint "must provide fair notice to the

defendants and state a facially plausible legal claim." *Ocasio–Hernández v. Fortuño–*

*Burset,* 640 F.3d 1, 12 (1st Cir. 2011).  "Ordinarily, a court may not consider any

documents that are outside of the complaint, or not expressly incorporated

therein." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir.

2001).  But there is a narrow exception for certain documents that the parties agree

are authentic and that are central to the plaintiff's claims. *Watterson v. Page,* 987

F.2d 1, 3 (1st Cir. 1993).

# III. LEGAL ANALYSIS

## A.      The Status of the Sale Proceeds

The Trustee argues on appeal that the Bankruptcy Court erred when it concluded that the Complaint failed to plausibly allege that the FRA released its lien in the proceeds of the sale of the Lines, and argues that, on the contrary, the allegations contained in the Complaint establish that the FRA released its lien in the Lines and the sale proceeds prior to payment being made to Wheeling. The Trustee points to paragraphs 20, 28, 29, 31, and 32 of the Complaint, and at oral argument, cited paragraph 50 of the Complaint. The Trustee also appeals the Bankruptcy Court's dismissal of his Complaint with prejudice, arguing that he should have been granted leave to amend.

The Trustee's argument fails in light of § 3(b) of the Second Amendment, which is the only provision that grants a limited waiver of the FRA's security interest in the Lines and which made the waiver effective "upon [c]losing." Pl.'s App. at 103. The Trustee's claims are not plausible because the specificity with which § 3(b) of the Second Amendment directs how the sale proceeds are to be disbursed establishes that at no time were the sale proceeds permitted to go to MMA in their entirety. *Id.* Instead, the funds were required to be paid to an escrow agent to be held until the FRA perfected its replacement lien. Only then was disbursement permitted, in the order and in the specified amounts dictated by the Second Amendment. *Id.* Further, none of the paragraphs of the Complaint cited by the Trustee in opposition to the motion to dismiss, which I address, below, require a different result.

### 1. Paragraph 20

Paragraph 20 of the Complaint cites to a clause in the Second Amendment's preamble which states that "a condition precedent to a sale of the Lines of the State is the release of the [FRA's] interest in the Lines pursuant to the Mortgage and Security Agreement . . . so that [MMA] is able to convey the Lines to the State free and clear of such liens and encumbrances[.]" Pl.'s App. at 99. This language does not establish that the FRA released its interest in the sale proceeds, however, because it refers exclusively to a release of the FRA's interest in the Lines, and makes no mention of the sale proceeds. Moreover, the clause is prefatory and subject to the more specific provisions in the body of the agreement. *See id.* While the clause states that the release of the FRA's lien is a condition precedent, the only provision that actually directs the release of any security interest is § 3(b), which, as discussed above, simultaneously directs the disbursement of the sale proceeds. *See* Pl.'s App. at 103.

### 2. Paragraphs 28 and 29

Paragraph 28 alleges that, "in exchange for releasing its security interest in the Lines, the FRA agreed to receive only $2,372,934.96 of the $21,100,000 from the sale of the Lines to the State of Maine." *Id.* at 6. Paragraph 29 alleges that the FRA "agreed to release its security interest in the Lines without receiving the full amount of the proceeds of the sale." *Id.* Both of these allegations are supported by the Second Amendment and are taken as true, yet neither leads to the conclusion that the sale proceeds were unencumbered when Wheeling was paid.

### 3.     Paragraph 32

Paragraph 32 is one of only two paragraphs in the Complaint to allege that, at the time the $2,708,912.20 was paid to Wheeling, the funds were completely unencumbered.  Pl.'s App. at 6-7, ¶ 32.  It states that:

> [I]n connection with the sale of the Lines, the Debtor paid Wheeling not less than $2,708,912.20, *even though the FRA, not Wheeling, was entitled to the proceeds of the sale of the Lines* . . . . Upon payment to Wheeling, the proceeds were unencumbered proceeds from the sale of the track assets.

*Id.* (emphasis added).  The Trustee argues that, as a consequence of this allegation, he is entitled to the inference that the unencumbered assets were assets of the MMA Estate and, therefore, were subject to the Maine Uniform Fraudulent Transfer Act. However, the very terms of Paragraph 32 contradict the Trustee's argument because it states that the FRA was entitled to the proceeds of the sale of the Lines and specifies that the funds were unencumbered only "upon payment to Wheeling."  *Id.*

### 4.     Paragraph 50

Paragraph 50 states that the $2,708,912.20 paid to Wheeling consisted "entirely" of unencumbered assets.  Pl.'s App. at 9.  It also alleges that "the FRA released its interest in the Lines . . . *prior* to the payment to Wheeling."  *Id.* (emphasis added).  This latter allegation contradicts Paragraph 32 of the Complaint.  Moreover, these allegations are simply not plausible in light of the provisions of § 3(b) of the Second Amendment, which, as noted above, directs how the sale proceeds are to be disbursed "upon [c]losing" and which do not permit the sale proceeds to go to MMA in their entirety.  *Id.* at 103.

### 5. Conclusion

For the reasons explained above, the Trustee's argument that the FRA released its lien in the Lines and the sale proceeds prior to payment being made to Wheeling is undercut by § 3(b) of the Second Amendment, which granted a limited waiver of the FRA's security interest in the Lines, but not the sale proceeds, upon the closing of the sale and which simultaneously directed to whom the sale proceeds should be paid. Therefore, the sale proceeds, including the payment of $2,708,912.20 to Wheeling, were not an asset of MMA within the meaning § 3576 of the Maine Uniform Fraudulent Transfer Act. I therefore affirm the order of the Bankruptcy Court dismissing the Trustee's complaint.

### B. Dismissal With Prejudice

In addition to his other objections to the Bankruptcy Court's dismissal of the complaint, the Trustee also argues that dismissal with prejudice was improper. For support, he cites Federal Rule of Civil Procedure 15(a)(2), which states that a court should "freely give leave" to amend a pleading "when justice so requires,"[4] and the Supreme Court's decision in *Foman v. Davis,* in which the court stated that leave to amend should be freely given in the absence of "undue delay, bad faith or dilatory motive." *Foman,* 371 U.S. 178, 182 (1962). Wheeling argues in opposition that the Trustee waived the right to amend because he never sought leave to do so, and furthermore, that amendment would be futile because of the clear language contained in § 3(b) of the Second Amendment.

---

[4] Federal Rule of Bankruptcy Procedure 7015 states that Fed. R. Civ. P. 15 applies in adversary proceedings. Fed. R. Bankr. P. 7015.

The Trustee's argument is undercut by the fact that he engaged in undue delay. More than 17 months passed between Wheeling's July 2015 motion to dismiss and the Bankruptcy Court's December 2016 order granting the motion, during which time no request for leave to amend was made. *See* Adversary Proceeding No. 15-01011, ECF No. 8; ECF No. 37. An additional month passed before the Trustee appealed the Bankruptcy Court's order, and two more months passed before the Trustee raised the possibility of amending the complaint for the first time in his appellate brief to this court. *See* ECF No. 5 at 28-29.

"[W]hen considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has at the very least the burden of showing some valid reason for his neglect and delay" including "what [he] knew or should have known and what he did or should have done." *In re Lombardo,* 755 F.3d 1, 3-4 (1st Cir. 2014) (quotations omitted). "Considerable time" warranting explanation includes time periods of 14 months or longer. *Id.* at 3; *see also Palmer v. Champion Mortgage,* 465 F.3d 24, 30-31 (1st Cir. 2006) (plaintiff's request for leave to amend more than 15 months after commencing the action was denied where no new, previously unavailable, evidence had come to light). The Trustee offers no explanation for the delay in this case. ECF No. 5 at 28-29.

Furthermore, the Trustee offers no factual details as to how the complaint would be amended if leave were to be granted. *See id.* Instead, he asserts that he would "make allegations further clarifying his contentions that the FRA lien was released as to the sale proceeds prior to the payment to Wheeling." *Id.* at 29. But it is unclear whether these new allegations involve facts that just recently came to light

11

or whether the Trustee has had knowledge of them throughout the litigation. Such ambiguity is disfavored, as it "virtually shields a plaintiff from any scrutiny under a futility analysis." *Flores-Silva v. McClintock-Hernández,* 710 F.3d 1, 4 (1st Cir. 2013) (affirming the district court's denial of leave to amend where the plaintiff did not include a proposed amended complaint or give details about how the complaint would be amended).

More generally, the First Circuit has stated categorically that "[w]e wish to discourage this practice of seeking leave to amend after the case has been dismissed." *Fire and Police Pension Ass'n of Colorado v. Abiomed, Inc.,* 778 F.3d 228, 247 (1st Cir. 2015). Justice would not be served by permitting the Trustee to amend at this stage of the litigation, where he was "put on notice of the deficiencies in the complaint by the motion to dismiss," *id.,* but only seeks to amend his complaint after having received an unfavorable decision from the Bankruptcy Court.

Even if the Trustee had not engaged in undue delay, dismissal with prejudice would still be appropriate because he asserts that his amendment would "clarify[ ] his contentions that the FRA lien was released as to the sale proceeds prior to the payment to Wheeling. ECF No. 5 at 28-29. Such an amendment would be futile, as explained in the foregoing analysis, because the sale proceeds were encumbered until they were paid to Wheeling pursuant to § 3(b) of the Second Amendment. *See Mulder v. Kohl's Dept. Stores, Inc.,* --- F.3d ----, 2017 WL 3167620, at * 2 (1st Cir. July 26, 2017) ("a district court may deny leave to amend when the requested is characterized by . . . futility.").

## IV. CONCLUSION

For the reasons explained above, the order of the Bankruptcy Court is

**AFFIRMED.**

**SO ORDERED.**

**Dated this 14th day of August 2017.**

**/s/ JON D. LEVY**
**U.S. DISTRICT JUDGE**
